## UNITED STATES DISTRICT COURT
## EASERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**                **Case No. 19-cr-20836**
                                         **Hon. Mark A. Goldsmith**

**vs.**

**JEFFREY BAUM**

        **Defendant.**

_____

## DEFENDANT'S SENTENCING MEMORANDUM

## I.   INTRODUCTION

JEFFREY BAUM is scheduled to be sentenced before this Honorable Court on September 26, 2024, at 9:00 a.m. Pursuant to a Rule 11 Plea Agreement, Mr. Baum pleaded guilty to Count 1 of the Indictment which charged Mr. Baum with violation of 18 U.S.C. §§371(a) and 666(a).

As this Court is acutely aware, the Court is required to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. §3553.  The Court must consider all the factors set forth in 18 U.S.C. §3553(a).

In determining a sentence, the sentencing court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

1

punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007). Mr. Baum urges the Court to find that, considering all the 18 U.S.C. §3553(a) factors, the sentencing guidelines overstate the goals of sentencing, and a non-custodial sentence is appropriate under the totality of the circumstances in this case.

## II.   SENTENCING FACTORS PURSUANT TO 18 U.S.C. §3553(a)

The United States Code is quite explicit about the role of 18 U.S.C. §3553(a) in sentencing determinations. 18 U.S.C. §3582 specifically states:

> The court, in determining whether to impose a term of imprisonment and, if a term of imprisonment is to be imposed in determining the length of this term, *shall consider* the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation. (Emphasis added).

There is no limitation on the information concerning the background, character and conduct of a defendant which a court may receive and consider for the purposes of imposing an appropriate sentence. 18 U.S.C. §3661. Previously disapproved or disfavored departure factors such as physical condition (U.S.S.G. §5H1.4); employment record (U.S.S.G. §5H1.5); family ties and responsibilities (U.S.S.G. §5H1.6); socio-economic status (U.S.S.G. §5H1.10); and substance abuse (U.S.S.G. §5H1.4) may now be considered. The district court makes independent assessments to arrive at an individualized sentence determination.

Mr. Baum respectfully requests that the Court consider the following 3553(a) factors and impose a non-custodial sentence.

2

### A. NATURE AND CIRCUMSTANCE OF THE OFFENSE PURSUANT TO 18 U.S.C. §3553(a)(1)

Mr. Baum first met Richard Sollars when they were young boys playing little league baseball. Mr. Baum had very little contact with Mr. Sollars over the ensuing years. When Mr. Sollars was elected Mayor of the City of Taylor in 2013, he contacted Mr. Baum and asked if Mr. Baum was interested in working in his administration as the Director of Community Development.

At the time, Mr. Baum had just earned a bachelor's degree from Eastern Michigan University. He was raising two sons and working as a substitute teacher. Mr. Baum was barely earning a living and the opportunity to work for his hometown where he was born and raised certainly was a great opportunity. Moreover, working for the Mayor would provide a steady income so Mr. Baum could provide for his two sons.

Accordingly, in 2014, Mr. Baum accepted the position of the City of Taylor's Manager of Community Development. It is important for the Court to note that Mr. Baum had many other responsibilities other than the "Right of First Refusal" program ("ROFR"). Attached as Exhibit 1 is a list of responsibilities that Mr. Baum had as the Manager of Community Development.

In 2015, the City of Taylor instituted the ROFR program. Under this program, the City would acquire tax foreclosed properties within its city limits from the Wayne County Treasurer's Office. These properties were single family

3

homes. Once the City acquired the homes, developers were selected to rehab the properties. Once the rehabbed properties were completed, the City would issue a certificate of occupancy and ownership would be transferred to the developers. This was a highly successful program. The dilapidated homes were now livable which increased the tax base for the City and helped to eradicate blight throughout Taylor.

The Court should note that City Council had to approve the developers who bid on the properties. While it is true that Shady Awad received a majority of the properties, his company, Realty Transition, LLC, did an excellent job rehabilitating the properties. The Court should also note that Mr. Baum did not have the final say as to which developer received the contracts.

It is also important to note that once Mr. Sollars decided to give Shady Awad the lion's share of the properties, Mr. Baum had written two letters to the cities of Madison Heights and Hamtramck on behalf of HP Snap, one of the developers who was involved in the ROFR program and who was eventually shut out by Mr. Sollars.

Attached as Exhibits 2 and 3 are the two letters of recommendation that Mr. Baum wrote on behalf of HP Snap. After Mr. Sollars' Chief of Staff, Robert Dickerson, found out about the letters, Mr. Dickerson temporarily suspended Mr.

Baum from the ROFR program. Mr. Dickerson was Mr. Baum's direct supervisor in the chain of command.

Moreover, in terms of the allegations set forth in the Indictment, Mr. Baum had nothing to do with the following:

1.    Trips to Las Vegas with Sollars, Awad and Dickerson;

2.    Installation of hardwood flooring for Sollars' residential home;

3.    Painting services for Sollars' residential home;

4.    The purchase of the humidor;

5.    Hardwood floors for Sollars' lake house;

6.    Kitchen appliances for Sollars;

7.    Deck refinishing at Sollars' residential home;

8.    New garage door for Sollars' residence;

9.    Garage locker system for Sollars' residence;

10.   Metal tool cabinets for Sollars' residence;

11.   Hardwood flooring for the basement at Sollars' residence;

12.   Washer and dryer appliances for Sollars' residence;

13.   A Dyson vacuum cleaner for Sollars' wife;

14.   Hardwood flooring for the main floor of Sollars' residence;

15.   Front door for Sollars' residence; and

16.   Sollars' and Awad's credit card transactions.

Mr. Baum has admitted that he received $500 in cash from Hadir Altoon on December 24, 2017. The money was placed in a Christmas card. Mr. Altoon knew that Mr. Baum was not a rich man and that the money was given so he could give his boys a decent Christmas.

On December 24, 2018, Mr. Altoon gave Mr. Baum $100 for each of his boys and $300 in cash to Mr. Baum. Mr. Altoon and Mr. Baum were good friends. On many occasions, Mr. Baum would stop at Mr. Altoon's party store and pick up food for Mr. Baum and his sons.

As stated above, Mr. Baum did not have the authority to transfer any properties to any developer under the ROFR program. Mr. Baum acknowledges that per Mr. Sollars' instructions, Mr. Baum facilitated the transfer of nine properties, originally given to Shady Awad, to Mr. Altoon. Mr. Baum admits that he did receive $2,500 in cash from Mr. Altoon.

Regarding Mr. Baum's involvement with Mr. Sollars' Committee to Re-Elect, Mr. Baum admits that he made a horrible decision when he gave Mr. Sollars blank checks that were cashed by Sollars at Mr. Altoon's party store. He also acknowledges that it was a mistake to payoff Mr. Sollars' vehicle with Committee to Re-Elect funds. He also admits that he was wrong for acting as a "bagman" for Sollars in picking up $5,000 on two occasions and placing the money in Sollars' vehicle and not recording the transactions. One of these occasions, it was Robert

Dickerson who directed Mr. Baum to pick up the money from a Ronnie Asmer, who owned a marijuana dispensary. Mr. Baum received a marijuana joint from Mr. Asmer for picking up the money.

It is further alleged by the Government that Mr. Baum directed the City Attorney for Taylor to dismiss 21 civil infraction tickets that were issued to Shady Awad's company in connection with the ROFR program in or about January, 2019. The fact of the matter is that it was Robert Dickerson, Sollars' Chief of Staff, who directed Mr. Baum to contact the City Attorney and have the civil infraction tickets dismissed. Mr. Baum did not do this on his own.

In the final analysis, Mr. Baum has acknowledged his wrongdoing. However, Mr. Baum never got rich over this entire situation. Basically, he was stuck between a rock and a hard place. As Mr. Baum stated during his Probation Interview, he enriched the Mayor, let his community, co-workers, family and friends down. He realized that he should have worried less about job security and should not have enabled the Mayor and done what was right rather than protect his personal interests, which was keeping his job.

**B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT PURSUANT TO 18 U.S.C. §3553(a)(1)**

In determining an appropriate sentence, this Honorable Court must consider not only the nature and circumstances of the offense, but also the history and characteristics of Mr. Baum. 18 U.S.C. §3553(a)(1) codifies the fundamental

principle that the Court is to sentence a human being and is not to be judged simply on the misdeeds which have brought him before the Court.

The Offender Characteristics reported at paragraphs 69 through 107 of the Amended PSIR, are an accurate recitation of Mr. Baum's personal and family data, his physical condition, his mental and emotional health, his substance abuse issues, his education, employment history and financial condition.

As set forth in the PSIR, Mr. Baum's mother sums up what Mr. Baum is really all about:

> "[That] he is a good person who has never been in trouble . . .. He is kind-hearted, giving, not mean and cares for his lifelong friends and family. He is good to me and his father. He puts his kids above everything."

(*See*, PSIR, ¶70).

In fashioning its sentence, Mr. Baum respectfully requests that the Court consider the following character letters.

1.   <u>Thomas A. Barszczowski</u>

Mr. Barszczowski is Mr. Baum's godfather who has known the Baum family for over 50 years. In his letter he writes about how Mr. Baum graduated from college and was a successful girls basketball coach and teacher. That Mr. Baum is a good son, brother and father and a friend to many people. Mr. Barszczowski has been a teacher for 32 years and taught Mr. Baum at JFK High School in Taylor. He was also his little league baseball coach. He notes that Mr. Baum worked hard in

school. He also writes that as a teacher, Mr. Baum's mistakes "should not be the sole determination of his true character." (Exhibit 4).

2.    Tony Burton

Mr. Burton was Mr. Baum's supervisor at the UAW skilled trades at CBRE/Ford, where Mr. Baum is currently employed. Mr. Burton writes that during his time as Mr. Baum's supervisor, "It was an absolute gift to have him on my team." Mr. Burton vouches for Mr. Baum's "character, stability, and most importantly a caring attitude that still affects his employer, employees, friends and family." Mr. Burton further writes that Mr. Baum goes "above and beyond daily" and "[w]hen it came time to have semi-annual reviews, Jeff was the easy one." (Exhibit 5).

3.    Brittany Teets Payne

Ms. Payne met Mr. Baum while she was a sophomore in high school during the 2007-2008 school year. Mr. Baum was Ms. Payne's high school basketball coach for 3 years. During these formative years, Ms. Payne writes that Mr. Baum was more than a coach. He was a mentor and a person she could look up to and count on. Ms. Payne also knew that Mr. Baum was a single dad and that she admired him in that role. After high school, Ms. Payne went on to college and played basketball. Mr. Baum would come to her games and always bring his sons. Mr. Baum was someone who made a positive impact on Ms. Payne. Mr. Baum

exhibited "kindness, compassion and just lending an ear." Ms. Payne is now the coach of the Lincoln Park Girls High School Basketball Team and credits Mr. Baum in large measure for the person she is today. Ms. Payne is married and has a family of her own. She writes how Mr. Baum is still a part of her life and that she views Mr. Baum as the paternal figure who "guided and helped mold me into the woman I am today." (Exhibit 6).

    4.    <u>Larry Thomas Gray</u>

Mr. Gray was taught by Mr. Baum's father, Mike, at Taylor Kennedy High School. He writes how Mr. Baum's father had a significant impact on his "personality, work ethic, leadership, integrity, honesty and several other characteristics." In 1985, Mr. Gray was a high school sophomore and Mr. Baum was in grade school. Mr. Gray kept in touch with the Baum Family and was always impressed with Mr. Baum. Mr. Gray helped Mr. Baum secure employment after he lost his job with the City of Taylor. Mr. Gray's friend who employed Mr. Baum was impressed with Mr. Baum and thanked Mr. Gray for the recommendation. Mr. Gray writes that he is proud to know Mr. Baum and that he hopes the Court consider "his core personality characteristics." (Exhibit 7).

    5.    <u>Crystal Gonzales</u>

Mr. Baum met Ms. Gonzales when they were very young. They attended middle school and high school together. In 2007, the two began dating and in 2009

they had their son Chase. At that time, Mr. Baum already had custody of his son Aaron who was born in 2006. The relationship between Mr. Baum and Ms. Gonzales ended in 2014. Since 2014, the two have shared custody of Chase and have remained friends as evidenced by the character letter penned by Ms. Gonzales. She describes Mr. Baum as a loving and caring father who would do anything for his sons. She further writes that Mr. Baum enjoys making memories with his sons and that he takes pride in being a good father. Both boys have excelled socially and scholastically and are thriving. (Exhibit 8).

      6.   <u>Gary R. Sweetapple</u>

Mr. Sweetapple has been employed at the Ford Motor Company where Mr. Baum supervises the skilled trades department. Mr. Baum is Mr. Sweetapple's direct supervisor. Mr. Sweetapple describes Mr. Baum as a friend and that he is grateful and honored to speak on Mr. Baum's behalf. He writes that Mr. Baum is able to effectively navigate a stressful work environment that involves the UAW and Ford management. He also writes that Mr. Baum is "the person I'd want on my team" and that he guides his people with "compassion, integrity and humor." Mr. Baum is respected by those he supervises. He also describes Mr. Baum as a "stand-up father" who is dedicated to his sons. Mr. Sweetapple writes that Mr. Baum embodies character and is an honorable person. (Exhibit 9).

### C.   THE NEED FOR THE SENTENCE IMPOSED PURSUANT TO 18 U.S.C. §3553(a)(2)(A)-(D)

Mr. Baum understands and accepts that there are consequences for bad decisions. He fully understands that the Court must impose a sentence that reflects the seriousness of his offense and to promote respect for the law. Mr. Baum has taken responsibility for his actions. This is evidenced by his timely admission of guilt and acceptance of responsibility for his actions. Mr. Baum has never been in trouble in his life. He certainly didn't enrich himself other than accepting small accounts of cash from Hadir Altoon and enabling the Mayor by signing blank checks and using Committee to Re-Elect funds to pay the Mayor's bills and taking money so he could give his sons some extras that he otherwise could not afford. The bottom-line is that a custodial sentence is not warranted in this case. Mr. Baum is a good person who made some bad decisions.

### 1.   Seriousness of the Offense, Respect for Law and Just Punishment

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment. In August of 2003, Justice Anthony Kennedy gave a speech at the ABA Annual Meeting in San Francisco where he stated:

> Our resources are misspent, our punishments too severe; our
> sentences too long . . . the sentencing guidelines are responsible
> in part for the increased terms. . . [and they] should be revised
> downward.

On February 14, 2007, Justice Kennedy again addressed this issue when he

testified before the Senate Judiciary Committee and stated:

> Our sentences are too long, our sentences are too severe; our
> sentences too harsh . . . there is no compassion in the system.
> There's no mercy in the system.

In *United States v.  Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011), the

Court addressed the length of the prison sentences in the United States:

> The increased prison population is due in large part to longer
> sentences. For the same crimes, American prisoners receive
> sentences twice as long as English prisoners, three times as long
> as Canadian prisoners, four times as long as Swedish prisoners.
> Yet these countries' rates of violent crime are lower than ours,
> and their rates of property crime are comparable.

In light of Mr. Baum's absence of a criminal history and his involvement in

lawful, beneficial community activity, it is clear that a custodial sentence is not

necessary to promote respect for the law and, in his case, it is clear that the

certainty of punishment that adequately constitutes "just punishment" for this

offense. Moreover, given his felony conviction, Mr. Baum will lose his ability to

teach or coach in Michigan while still owing nearly $50,000 in student loans that

he incurred while earning his teaching degree at Eastern Michigan University.

### 2. <u>Deterrence to Criminal Conduct</u>

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." The facts of Mr. Baum's case do not suggest that a custodial sentence is necessary to deter Mr. Baum from engaging in future criminal conduct.

Insofar as the statute instructs the Court to consider the need for this sentence to act as a general deterrent to others, there is no evidence, empirical or otherwise, that a custodial sentence in this case would deter others. The United States Sentencing Commission has continued to study the theory of general deterrence and has encouraged research on the subject. Empirical research has shown that while certainty has a deterrent effect, "increases in severity of punishment do not yield significant (if any) marginal deterrent effects". *Michael Towroy, Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." *Id*.

### 3. <u>Protection of the Public From Further Crimes of the Defendant</u>

Section 3553(a)(2)(C) requires the Court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." This purpose has to do with both the defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders

whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983). It is not so important for first time, nonviolent offenders, for those with limited criminal histories, for those who have little risk of recidivism, or for those who have a strong potential for rehabilitation.

The United States Sentencing Commission conducted a study entitled "Measuring Recidivism." http//www.ussc.gov/pullicat/Recidivism_General.pdf. The Commission offered a statistical analysis of the type of person most likely and least likely to re-offend. The study demonstrates that the risk of Mr. Baum re-offending is virtually nil and also lends support to the proposition that it is important in this case not to impose a custodial sentence.

The study demonstrated that 1) those over 50 are less likely to recidivate than those under 50; 2) those who have not used illicit drugs, are less likely to recidivate than those who did; 3) those who are or have been married are less likely to recidivate than those who have never been married; 4) non-violent offenders are less likely to recidivate than violent offenders; 5) first time offenders are less likely to recidivate than repeat offenders; 6) those who are employed are less likely to recidivate than those who aren't; and 7) those who are sentenced to non-jail sentences are less likely to recidivate than those who receive jail.

Mr. Baum has always been a good son, brother, father and friend. Mr. Baum has always been a productive and contributing member to his community and to

society at large. The character letters attached to this Memorandum are a testament to Mr. Baum's overall character that supports the argument that Mr. Baum will not be a repeat offender.

### D.     THE KINDS OF SENTENCES AVAILABLE PURSUANT TO 18 U.S.C. §3553(a)(3)

In the Sentence Reform Act, Congress recognized "…the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. §994(j) (emphasis added). Given the totality of the circumstances, a non-custodial sentence is appropriate in this case.

### E.     THE SENTENCING RANGE SUGGESTED BY THE SENTENCING GUIDELINES PURSUANT TO 18 U.S.C. §3553(a)(4)

The Government, Mr. Baum and Probation agree that the applicable guideline range is 37-46 months. This calculation is based upon a total offense level of 21 and a criminal history category of I. For the reasons stated herein, the guideline range grossly overstates the nature of Mr. Baum's conduct. Over $36,000 in fraud amounts are being attributed to Mr. Baum in connection with the blank checks that he signed and gave to Mr. Sollars. As set forth in paragraph 42 of the Amended PSIR, Sollars cashed these checks at Mr. Altoon's market in exchange for cash and/or scratch off lottery tickets. To be sure, Mr. Baum did not personally benefit from these transactions nor did he have anything to do with the fraudulent invoices.

16

In, *Rita v. United States*, 551 U.S. 338 (2007) the Supreme Court held that the district courts can conclude that the guideline sentence fails to reflect 18 U.S.C. §3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate "regardless." Sentencing is a difficult and nuanced art. It is easy to make it mechanical by woodenly applying the guideline range.

Sentencing should be an act of reason by the judge looking at a particular person, the circumstances of the crime this person has committed and then making a judgment. *United States v. Dominquez*, 296 F.3d 192, 196 n.7 (3rd Cir. 2002) ("The Guidelines do not require a judge to leave compassion and common sense at the door to a courtroom".); *United States v. Meyers*, 353 F. Supp. 2d 1026, 2017 (S.D. Iowa 2005) ("[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm."); *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. Va. 2005) ("fashioning a just sentence cannot be reduced to a mere arithmetical exercise and that reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produce an illusory precision that obscures the fact *that sentencing in the end, must involve the exercise of judgment*".) (Emphasis added).

Variances are an important part of the sentencing process because they offer the opportunity to ameliorate the rigidity of the Guidelines. Many courts have

recognized that district judges need not shrink from utilizing variances when the opportunity presents itself and when the circumstances require such action to bring about a fair and reasonable sentence.

This Court should give minimal weight to the guideline range in its analysis of the §3553(a) factors as they apply to Mr. Baum's sentence, s*ee, United States v. Aldelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998).

## F. ANY PERTINENT POLICY STATEMENT FROM THE SENTENCING COMMISSION PURSUANT TO 18 U.S.C. §3553(a)(5)

This factor is not applicable.

## G. THE NEED TO AVOID UNWANTED SENTENCING DISPARITIES PURSUANT TO 18 U.S.C. §3553(a)(6)

As of this writing, none of the other Defendants have been sentenced. As such, it is impossible to comment about any possible sentencing disparities. However, in April, 2024, the former Mayor of Romulus was sentenced to three years of probation by a Judge of this Court. After, the former Mayor pleaded guilty to stealing thousands of dollars in campaign funds to support his lavish lifestyle as described by the Government. Here, Mr. Baum was certainly not the Mayor nor did he steal money or accept cash gifts to support a lavish lifestyle.

**H.   THE NEED TO PROVIDE RESTITUTION PURSUANT TO 18 U.S.C. §3553(a)(7)**

As stated in the Amended PSIR, restitution is not applicable as there is no identifiable victim. *See* PSIR, ¶¶ 119 and 134.

## III.   CONCLUSION

Although lawyers and legislatures speak in a statutory framework, sentencing is an inherently human endeavor.  That is why the law entrusts this decision to judges, not guidelines.  The guidelines are a preliminary step.   They are only one factor; they have no more weight than any other factor.

Among my many other problems with the guidelines, putting aside their irrationality, putting aside their draconian far too punitive approach to all crimes, not just white collar crimes, putting aside their very real responsibility for the portion of the mass incarceration of which this country should be so ashamed, is the fact they regard sentencing as an exercise in bean counting, as opposed to one of the most difficult tasks that those fallible human beings we call judges have to undertake, which is a moral judgment on a fellow human being.

But, Congress, in its wisdom in enacting Section 3553 has very clearly recognized the moral judgments involved, because they put first and foremost that the Court must focus on the nature and circumstances of the offense, in this egregious, and history and characteristics of the defendant, . . . And they direct how the Court is to resolve that tension. And also to take account of the somewhat more abstract, but still very fundamental purposes, of sentencing such as deterrence, just punishment, and the like.

By decreeing that the Court shall impose a sentence sufficient, but not greater than necessary, to comply with these various purposes, that's an expression of a moral judgment, too. That's an expression of the notion that even in this cruel world where people commit, as the defendant has here, terrible offenses, the punishment of prison is not one that can ever be justified beyond the purposes that Congress has specified. It can never be

an act of revenge, it can never be an act of gratuitous expression of outrage. Life is too precious to permit that kind of sentence.

*United States v. Caspersen*, Case No. 16-00414, (USDC, SDNY, December 7, 2016), pp 80-81, Hon. Jed Rakoff.

Mr. Baum has taken full responsibility for his conduct. Mr. Baum is prepared to accept this Court's sentence. However, Mr. Baum respectfully submits that his current state of affairs and his positive efforts militate against a custodial sentence.

For all the reasons set forth above, Mr. Baum respectfully requests a sentence that is "sufficient but not greater than necessary" to comply with all the sentencing factors. Mr. Baum respectfully and humbly submits that a sentence of probation, satisfies the sentencing scheme.

Respectfully submitted,

*/s/ Michael A. Rataj*
MICHAEL A. RATAJ (P43004)
Attorney for Jeffrey Baum
500 Griswold, Suite 2450
Detroit, MI 48226
313-963-4529

Dated:  September 15, 2024

## <u>CERTIFICATE OF SERVICE</u>

Michael A. Rataj hereby states that on September 15, 2024, I electronically filed *Defendant's Sentencing Memorandum and Certificate of Service* with the Clerk of the Court using the ECF system which will send notification of such filing to all parties listed on the Electronic Mail Notice List.


*/s/ Michael A. Rataj*
MICHAEL A. RATAJ